# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **ERNEST C. HOLLAND, JR.,** | )<br>) |
| Plaintiff, | ) Case No. 7:13CV00057<br>) |
| v. | ) **OPINION AND ORDER**<br>) |
| **DR. D. MILLER,** | ) By: James P. Jones<br>) United States District Judge |
| Defendant. | ) |

*Ernest C. Holland, Jr., Pro Se Plaintiff; Mary Foil Russell, Hale, Lyle & Russell, Bristol, Tennessee, for Defendant.*

The plaintiff, Ernest C. Holland, a Virginia inmate proceeding pro se, brought this civil rights action under 42 U.S.C. § 1983, alleging inadequate medical treatment in violation of his Eighth Amendment rights. By an earlier Opinion and Order, the court dismissed all of Holland's contentions except his § 1983 claim that "he suffered from a painful hernia condition, that his condition was in need of treatment, and that [prison physician Daniel] Miller, out of deliberate indifference, refused the treatment Holland needed." *Holland v. Miller*, No. 7:13CV00057, 2014 WL 1308811, at *4 (W.D. Va. Mar. 31, 2014) (Wilson, J.). Before me now is Dr. Miller's Motion for Summary Judgment and Supplement.[1] Holland has responded, making the matter ripe for disposition. After

---

[1] In support of his motion and supplement, Dr. Miller offers his own affidavit with attached medical notes; a declaration from Dr. Hopkins, another VDOC physician

review of the record, I find that the Motion for Summary Judgment must be granted.

I.

Holland alleges a history of medical problems throughout his several years as an inmate in various prison facilities operated by the Virginia Department of Corrections ("VDOC"). He claims in this action that while he was incarcerated at Keen Mountain Correctional Center ("Keen Mountain") in 2012, Dr. Miller examined him twice and both times, failed to provide medical treatment for his hernia.

Holland alleges that he was diagnosed with Bulging Disk Degenerative Disorder in 1996 and has experienced back pain ever since. In April 2006, he began experiencing numbness in his left foot, and in October 2010, a doctor allegedly told him that he needed corrective surgery for his left knee, but no surgery occurred.

On March 15, 2012, Dr. Ohai at Powhatan Correctional Center examined Holland and diagnosed a "reducible, nontender" inguinal hernia on the right groin,[2]

---

assigned to Keen Mountain; a declaration from Eugene Whited, head nurse at Keen Mountain; and the VDOC Offender Health Care Plan (ECF Nos. 46 & 56).

[2] An inguinal hernia is a "hole in connective tissue of the abdominal wall that allows intestines to protrude through that connective tissue and push against muscle and fat that overl[a]y that connective tissue." (Hopkins Decl. ¶ 10, ECF No. 56-5.) The hernia is "reducible," if "the protruding intestines can easily be pushed back through the hole." (*Id.*)

an enlarged prostate, difficulty in urination, and chronic constipation. (Gibson Certification Attachment B, Ex. B-3, ECF No. 46-8.) Dr. Ohai prescribed Flomax to improve urine flow and Cordura and Colace to relieve constipation. He also began the process for a "gen[eral] surgery consult for evaluation and possible surgical treatment of enlarging r[ight] inguinal hernia." (*Id.*) Dr. Ohai's note ended with: "Pt. understands that therapy for enlarged prostate and chronic constipation is needed prior to hernia repair in order to prevent surgical treatment failure."[3] (*Id.*)

The next day, March 16, Holland was transferred to Keen Mountain, a maximum security prison, where officials placed him in the segregation unit. On March 17, Holland filed an emergency grievance, stating:

> I have lost most of the control & feeling in my lower left leg & foot[.] [I]t is completely numb. I have fallen in my cell and hurt my lower back. . . . I have a very serious hernia and back problems. I have been scheduled for surgery. . . . I have received none of my meds that were prescribed for these problems [a]nd now I have injured myself more. I am in severe pain. I [need] medical attention immediately.

(Compl. Ex. K, ECF No. 1-3.) A nurse ruled his complaint a nonemergency, but noted that he had been seen by medical staff and should use sick call procedure.

---

[3] Holland alleges that Dr. Ohai advised that he had a "very large hernia that had to be surgically removed as soon as possible," that the doctor "placed an order in plaintiff's medical chart to have the hernia removed," and that he told Holland that "it would all be taken care of, including [his] knee and back problems, which he also ordered surgery for." (Compl. ¶ 30, ECF No. 1.) Holland does not offer any documentation to support these allegations that Dr. Ohai ordered any type of surgery after his exam on March 15, 2012.

-3-

Holland allegedly filed a sick-call request on March 19, 2012, about these multiple complaints, but it is not in the record. On March 23, 2012, Holland filed an emergency grievance, stating that the hernia had popped out, causing pain, and he could not make it "retreat into his abdomen" (Compl. ¶ 41), but a nurse ruled the situation a nonemergency.

Dr. Miller states that he was asked to examine Holland on March 28, 2012, in the segregation unit on his complaints of pain in his back and left leg and worsening numbness in his foot. The doctor talked to Holland through the door and instructed him to walk around the cell holding onto the wall, as the doctor observed him through the cell door window.[4] According to Dr. Miller's notes, he told Holland that if his symptoms persisted after two weeks, he should put in for sick call to be reassessed. Dr. Miller allegedly said that he "would do nothing for [Holland] in the way of treatment, pain relief or otherwise,"[5] (Compl. ¶ 37), and

---

[4] For their personal security, physicians routinely conduct initial interviews and visual examinations of segregation unit inmates through the window in the cell door. If the doctor determines that a closer examination is necessary, "restraints are required and two correctional officers must escort the inmate" to the medical examination room in the segregation unit. (Whited Decl. ¶ 9, ECF No. 56-1.)

[5] According to Holland's declaration in response to the defendant's motion (ECF No. 52-2), Dr. Miller allegedly said that he would not prescribe any pain medication, but that Holland could buy an over-the-counter remedy if needed, and he did not alter his decision after Holland said he was indigent.

-4-

that Holland would need to file another sick call request if he wanted the doctor to discuss or address his hernia problem.[6]

Dr. Miller was next asked to see Holland in segregation on April 4, 2012, concerning his complaint about a right inguinal hernia. Observing no signs of an emergency or acute distress, Dr. Miller asked Holland through the door if he was able to reduce the hernia. Holland allegedly told the doctor that he could push the hernia back into his abdomen, but that it was extremely painful and often popped out under any exertion. Dr. Miller noted Holland's stated belief that the hernia was a result of straining to urinate.

From Dr. Ohai's medical notes of the March 15 exam, Dr. Miller saw that Holland had shown symptoms of constipation and benign prostatic hyperplasia ("BHP"), which is a progressive enlargement of the prostate. Based on those notes, his interview with Holland, and his own observations, Dr. Miller prescribed Flomax for treatment of BHP, Metamucil for treatment of constipation, and a hernia belt for treatment of the hernia.[7] Dr. Miller allegedly "told [Holland] that he

---

[6] Holland complains that Dr. Miller should have talked to him about his hernia at this visit. The record offers no indication, however, that the doctor would have been provided with Holland's alleged sick call request, which is not in the medical records, or his emergency grievances in conjunction with the March 28 exam. Holland states that he verbally informed Dr. Miller about his hernia during that exam, however.

[7] A hernia belt is "a support belt . . . worn to apply pressure over the hole and keep the intestines from pushing" out and "is in itself appropriate treatment" for a reducible inguinal hernia. (Hopkins Decl. ¶ 10, ECF No. 56-5.) Hopkins states that "it has been shown that risks of surgery are closely equivalent to the risks of leaving [a

would 'never have the hernia removed' while he was in the VDOC." (Compl. ¶ 40.)

Holland received the hernia belt on May 24, 2012. He wrote Dr. Miller a request form on June 11, 2012, asking "why he would never order an appropriate treatment for the hernia." (Compl. ¶ 43.) A nurse responded: "[A]ccording to the physician's assessment, the hernia belt should take care of it at this time." (*Id.* at ¶ 44.) In July 2012, Dr. Miller was assigned to another VDOC prison facility and had no further contact with Holland.

## II.

A party is entitled to summary judgment if the pleadings, affidavits, and attached records on file show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id.* A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952

---

reducible inguinal hernia] in place." (*Id.* ¶11.) VDOC policy for treatment of this type of hernia calls first for nonsurgical treatments, like the hernia belt, and observation, unless an emergency situation presents.

F.2d 820, 823 (4th Cir. 1991). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

To state a cause of action under § 1983, a plaintiff must establish that he has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment ban on cruel and unusual punishment and is actionable under Section 1983.[8] *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). A prison official is "deliberately indifferent" only if he was personally aware of facts indicating an "excessive risk to an inmate's health or safety," actually recognized the existence of such risk, and disregarded or

---

[8] Holland's hernia, identified by his prior physician as indicating evaluation for possible surgery, is a "serious" medical need for purposes of his Eighth Amendment claim. *See, e.g., Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (defining a "serious medical need" as, inter alia, "one that has been diagnosed by a physician as mandating treatment").

-7-

Case 7:13-cv-00057-JPJ   Document 59   Filed 03/26/15   Page 7 of 14   Pageid#: 397

responded unreasonably to that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"[A]n inadvertent failure to provide adequate medical care" does not amount to the deliberate indifference required to prove a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105-06 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Similarly, the deliberate indifference standard "is not satisfied by . . . mere disagreement concerning '[q]uestions of medical judgment.'" *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (unpublished) (quoting *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975)).

The claim before me is Holland's assertion that Dr. Miller acted with deliberate indifference to his complaints about his hernia and refused to consider ordering surgical repair of the hernia. Dr. Miller's evidence is that he evaluated Holland's medical complaints as he was asked to do and provided alternative treatment as he believed necessary in his medical judgment. I find from the record that Holland has failed to establish any genuine issue of material fact on which he could prove his claim of deliberate indifference.

Dr. Miller states that he was assigned by the nursing staff to assess Holland's complaint of back and leg pain, not his hernia, on March 28, 2012, and Holland presents no evidence to the contrary. In any event, Dr. Miller did not

"deny" Holland medical care for either of these complaints. The doctor talked to Holland and observed him walking about his cell, and in his medical judgment, saw no signs of acute distress that day that required a closer, hands-on examination or a prescription for pain medication. Holland believed that his painful conditions constituted acute distress and warranted a more in-depth exam and medication. Holland's mere disagreement with Dr. Miller's diagnosis and treatment decisions does not support a finding of deliberate indifference. *Russell*, 528 F.2d at 319.

Moreover, the doctor's advice for Holland to file a sick call request if the symptoms persisted was, at most, a delay, not a denial, of treatment. A significant delay in the treatment of a serious medical condition may, in the proper circumstances, indicate an Eighth Amendment violation. *See Estelle*, 429 U.S. at 104-05 (holding that deliberate indifference may be demonstrated by intentionally denying or delaying access to medical care). Even a significant delay in receiving medical care, however, violates the Eighth Amendment only "if the delay results in some substantial harm to the patient." *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008) (unpublished) (defining substantial harm as being "evidenced by . . . a marked increase in" the symptoms complained of or their severity) (cited more than 100 times by courts in the Fourth Circuit); *see also Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005).

I cannot find that Dr. Miller's treatment decisions on March 28 caused any significant delay of treatment for Holland. First, Holland himself does not allege filing any further sick call requests regarding his back pain. If Holland did not follow required procedures to seek additional assessment of those conditions, he cannot blame Dr. Miller for failing to provide such medical attention. Second, when Holland filed a sick call request about his hernia complaint, Dr. Miller saw him within days — on April 4. Moreover, Holland does not allege that his hernia symptoms significantly increased in severity between these two visits with Dr. Miller.[9] Therefore, I find no material fact in dispute and will grant summary judgment for the defendant on Holland's claims regarding the March 28 exam.

Holland's primary complaint about Dr. Miller's exam on April 4 is the doctor's alleged statement that Holland would never get his hernia repaired in prison. Dr. Miller denies making any such statement. I do not find this dispute between the parties' accounts to be material to Holland's claims. First, Dr. Miller's alleged comment is not inconsistent with the VDOC policy to try other treatments for a reducible inguinal hernia before considering surgery. Holland

---

[9] According to Holland, the doctor told him on March 28, 2012, that he would not provide any treatment, which Dr. Miller denies saying. This dispute over an isolated comment, however, is not material to my conclusion that Dr. Miller's actions on that day constituted a delay of treatment, rather than a denial of treatment, and did not cause any substantial increase in the symptoms of which Holland complains. *Webb*, 281 F. App'x at 166.

himself states that he was able to "reduce" the hernia by pushing the bulge back into his abdomen. He also offers no evidence in contradiction of Dr. Hopkin's declaration that the VDOC hernia policy is grounded in medical studies indicating that the risks associated with a surgery to repair a reducible inguinal hernia are "closely equivalent" to risks inherent in leaving the hernia in place.[10] (Hopkins Decl. ¶11.)

Second, Dr. Miller's alleged comment has no bearing on whether or not the doctor's actions constituted deliberate indifference, and I find they did not. When Dr. Miller came to Holland's segregation cell on April 4, 2014, he observed and talked to Holland through the cell window, decided no closer examination was necessary, and prescribed medications and a hernia belt. In reaching this medical judgment, Dr. Miller had the benefit of Dr. Ohai's medical notes from his exam barely two weeks earlier, as well as his own observations and discussion with Holland. Dr. Miller states that he continued the general treatment plan that Dr. Ohai had prescribed: Flomax to address Holland's enlarged prostate and help with

---

[10] In support of his deliberate indifference claim, Holland has submitted copies of information about hernia surgery from general medical websites. This documentation, however, confirms the medical validity of Dr. Miller's alternative treatment plan for Holland's reducible hernia. (Holland Decl. Attach. at 6, ECF No. 52-3 ("Waiting to have surgery does not increase the chance that part of your intestine or abdominal tissue will get stuck in your hernia. Waiting will also not increase your risk for problems, if you decide to have surgery later." . . . "Conditions that cause coughing or straining to pass stools or urine . . . may need to be treated before surgery so that the hernia is less likely to recur after repair."))

-11-

urination, Metamucil to address constipation, and the "hernia belt which could help to relieve any symptoms and possibly prevent the hernia from enlarging while getting other issues under control." (Miller Affid. ¶ 20, ECF No. 46-2.) In addressing a § 1983 claim, I cannot second-guess these considered medical judgments about the appropriate course of treatment for Holland's hernia.[11] *Russell*, 528 F.2d at 319 ("Questions of medical judgment are not subject to judicial review.").

Holland complains that by not ordering a pre-surgical evaluation and relying on Metamucil, an over-the-counter medication, Dr. Miller took a less aggressive treatment approach than did Dr. Ohai. Holland also disagrees with Dr. Miller's failure to prescribe pain medication. The minor discrepancies between the two doctors' treatment plans do not provide any support for a finding that Dr. Miller acted with deliberate indifference. The operative goals of the two doctors' treatment plans were identical — to treat the urination and constipation problems first. Neither doctor found that circumstances also warranted prescription pain medication. However, Dr. Miller's plan added the hernia belt to "help to relieve any symptoms," such as the pain caused when the hernia popped out and had to be

---

[11] I simply find no support in the record for Holland's conclusory assertions that Dr. Miller's refusal to order surgical repair of his hernia in April 2012 was influenced by the costs of such a procedure.

reduced, and to "possibly prevent" expansion of the hernia.[12]  (Miller Aff. ¶ 20, ECF No. 46-2.)  Most importantly, Holland presents no evidence that any doctor who has examined Holland since Dr. Miller did on April 4, 2012, has ordered immediate surgical repair of Holland's hernia.  (*See* Holland Aff. ¶ 15, ECF No. 52-2.)[13]

For the foregoing reasons, I find no genuine issue of material fact in dispute on which Holland could persuade a reasonable fact finder that Dr. Miller's treatment plan prescribed for his hernia on April 4, 2012, constituted deliberate indifference.  Therefore, the defendant is entitled to summary judgment as a matter of law.

---

[12]  Holland complains that he did not receive the hernia belt until several weeks after Dr. Miller prescribed it.  Holland also complains that Dr. Miller's treatment plan — the medications and belt — did not prevent the hernia from popping out when he used the bathroom or exercised.  He seeks to blame Dr. Miller for his inability to exercise, his resultant weight gain and weight-related back and knee problems, and his elevated blood pressure.  He offers no evidence, however, suggesting that Dr. Miller had any personal involvement in ordering the belt or that he ever complained to Dr. Miller that his hernia complaints continued.  Thus, I find no way in which Dr. Miller could be found deliberately indifferent regarding the delay in receiving the belt or in failing to address symptoms that continued to occur, or that first arose, after he stopped treating Holland.

[13] In his declaration dated July 21, 2014, Holland states: "My current physician has pledged to work with me to alleviate . . . the hypertension so that I would reasonably be within candidacy for hernia surgery."  (Holland Decl. ¶ 15, ECF No. 52-2.)

III.

For the stated reasons, it is **ORDERED** that the defendant's Motion for Summary Judgment (ECF No. 46) is GRANTED.

A separate Judgment in favor of the defendant will be entered herewith.

ENTER: March 26, 2015

/s/ James P. Jones
United States District Judge